FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 24, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WILLIAM P.,[1] | No.   4:21-cv-5008-EFS |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION, DENYING DEFENDANT'S SUMMARY-JUDGMENT MOTION, AND REMANDING FOR FURTHER PROCEEDINGS** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] | |
| Defendant. | |

Plaintiff William P. appeals the Administrative Law Judge's (ALJ) denial of benefits to him before he turned 50 years of age. Because the ALJ consequentially erred at step two by failing to find severe left upper extremity impairment(s) or impairment(s) of the right wrist/hand, Plaintiff's Motion for Summary Judgment, ECF No. 17, is granted, the Commissioner's Motion for Summary Judgment, ECF No. 18, is denied, and this matter is remanded for further proceedings.

---

[1] To protect the privacy of social-security plaintiffs, the Court refers to them by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Ms. Kijakazi is the Acting Commissioner of Social Security. She is therefore substituted for Andrew Saul as Defendant. Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

1

2

## I.      Five-Step Disability Determination

3

A five-step sequential evaluation process is used to determine whether an

4

adult claimant is disabled.[3] Step one assesses whether the claimant is engaged in

5

substantial gainful activity.[4] If the claimant is engaged in substantial gainful

6

activity, benefits are denied.[5] If not, the disability evaluation proceeds to step two.[6]

7

Step two assesses whether the claimant has a medically severe impairment

8

or combination of impairments that significantly limit the claimant's physical or

9

mental ability to do basic work activities.[7] If the claimant does not, benefits are

10

denied.[8] If the claimant does, the disability evaluation proceeds to step three.[9]

11

Step three compares the claimant's impairment or combination of

12

impairments to several recognized by the Commissioner as so severe as to preclude

13

substantial gainful activity.[10] If an impairment or combination of impairments

14

15

[3] 20 C.F.R. §§ 404.1520(a), 416.920(a).

16

[4] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

17

[5] *Id.* §§ 404.1520(b), 416.920(b).

18

[6] *Id.* §§ 404.1520(b), 416.920(b).

19

[7] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

20

[8] *Id.* §§ 404.1520(c), 416.920(c).

21

[9] *Id.* §§ 404.1520(c), 416.920(c).

22

[10] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

23

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.[11] If not, the disability evaluation proceeds to step four.

Step four assesses whether an impairment prevents the claimant from performing work he performed in the past by determining the claimant's residual functional capacity (RFC).[12] If the claimant can perform past work, benefits are denied.[13] If not, the disability evaluation proceeds to step five.

Step five assesses whether the claimant can perform other substantial gainful work—work that exists in significant numbers in the national economy—considering the claimant's RFC, age, education, and work experience.[14] If so, benefits are denied. If not, benefits are granted.[15]

If there is medical evidence of an addiction, the ALJ must also determine whether drug or alcohol use is a material factor contributing to the disability.[16]

---

[11] *Id.* §§ 404.1520(d), 416.920(d).

[12] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[13] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[14] *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Kail v. Heckler*, 722 F.2d 1496, 1497-98 (9th Cir. 1984).

[15] 20 C.F.R. §§ 404.1520(g), 416.920(g).

[16] 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 404.1535(a), 416.935(a).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 3

## II.    Factual and Procedural Summary

Plaintiff filed Title 2 and 16 applications, alleging a disability onset date of July 1, 2015.[17] His applications were denied initially and on reconsideration.[18] In 2018, an administrative hearing was held before ALJ Marie Palachuk, and she thereafter issued an unfavorable decision.[19] In 2020, the Appeals Council remanded the case for further proceedings.[20] A telephonic administrative hearing was held again before ALJ Palachuk, who took additional testimony from Plaintiff about his conditions and symptoms.[21] After the hearing, the ALJ issued a written decision partially granting Plaintiff's disability claims, finding:

- Plaintiff met the insured status requirements through December 31, 2020.

- Step one: Plaintiff had not engaged in substantial gainful activity since the alleged onset date of July 1, 2015.

- Step two: Plaintiff had the following medically determinable severe impairments: degenerative joint disease of the bilateral knees (status post arthroplasty of the right knee), rotator cuff impairment of the right

---

[17] AR 299–322.

[18] AR 178–81, 184–88.

[19] AR 42–72, 148–70.

[20] AR 171–75.

[21] AR 73–89.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 4

shoulder, degenerative disc disease of the lumbar spine, depressive

disorder, and polysubstance abuse (amphetamine, cannabis, and alcohol).

- Step three: Plaintiff's impairments, including the substance use disorder,

  met listing 12.04; however, if Plaintiff stopped the substance use, he

  would not meet or medically equal a listing.

- RFC: If Plaintiff ceased substance use, Plaintiff had the RFC to perform

  sedentary work with the following limitations:

  > he can only operate pedals bilaterally occasionally; he can never
  > climb ladders, ropes, or scaffolds; he can never crawl; he can
  > occasionally climb ramps and stairs; he can occasionally
  > balance, stoop, kneel, and crouch; he can perform overhead
  > reaching with the right upper extremity frequently; he can
  > perform handling and fingering bilaterally frequently; he must
  > avoid concentrated exposure to extreme temperatures and
  > vibration, and can have no more than moderate exposure to
  > hazards or uneven terrain; he is able to understand, remember,
  > and carry out simple, routine, repetitive tasks and instructions;
  > he is able to maintain concentration, persistence, and pace for
  > two hour intervals between regularly scheduled breaks; he can
  > have superficial interaction (clamed as noncollaborative/ no
  > tandem tasks) with the public or coworkers.

- Step four: Plaintiff was not capable of performing past relevant work if he

  ceased substance use.

- Step five: considering Plaintiff's RFC, age, education, and work history,

  Plaintiff could perform work that existed in significant numbers in the

  national economy before he turned 50 on April 8, 2019, such as final

  assembler, semi-conductor, and printed circuit board assembler; however,

  on April 8, 2019, when his age category changed, he could no longer

perform work that existed in significant numbers if he ceased substance use.[22]

In reaching her decision, the ALJ gave:

- significant weight to the reviewing opinions of John Morse, M.D., Elizabeth S. Louis, M.D., Howard Platter, M.D., and Marian Martin, Ph.D.

- partial weight to the reviewing opinions of Thomas Clifford, Ph.D., and Carla Van Dam, Ph.D.

- little weight to the reviewing opinion of Myrna Palasi, M.D., examining opinion of N. K. Marks, Ph.D., and treating opinions of Jason England, ARNP.[23]

The ALJ also found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of those symptoms were inconsistent with the medical evidence and other evidence.[24]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[25] Plaintiff timely appealed to this Court.

---

[22] AR 13–40.

[23] AR 28–30.

[24] AR 25–27.

[25] AR 1–6.

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[26] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[27] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[28] Moreover, because it is the role of the ALJ—and not the Court—to weigh conflicting evidence, the Court upholds the ALJ's findings "if they are supported by inferences reasonably drawn from the record."[29] The Court considers the entire record.[30]

---

[26] 42 U.S.C. § 405(g).

[27] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

[28] *Id.* at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[29] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

[30] *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

Further, the Court may not reverse an ALJ decision due to a harmless error.[31] An error is harmless "where it is inconsequential to the ultimate nondisability determination."[32]

## IV.    Analysis

**A.    Step Two: Plaintiff establishes consequential error.**

Plaintiff argues the ALJ erred by failing to find that his bilateral carpal tunnel syndrome or shoulder/elbow impairments were severe impairments.

1.    <u>Standard</u>

At step two of the sequential process, the ALJ must determine whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits his physical or mental ability to do basic work activities.[33] This involves a two-step process: 1) determining whether the claimant has a medically determinable impairment and 2), if so, determining whether the impairment is severe.[34]

Neither a claimant's statement of symptoms, nor a diagnosis, nor a medical opinion sufficiently establishes the existence of an impairment.[35] Rather, "a physical or mental impairment must be established by objective medical evidence

---

[31] *Molina*, 674 F.3d at 1111.

[32] *Id.* at 1115 (cleaned up).

[33] 20 C.F.R. §§ 404.1520(c), 416.920(c).

[34] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[35] *Id.* §§ 404.1521, 416.921.

from an acceptable medical source."[36] Evidence obtained from the "application of a medically acceptable clinical diagnostic technique, such as evidence of reduced joint motion, muscle spasm, sensory deficits, or motor disruption" is considered objective medical evidence. If the objective medical signs and laboratory findings demonstrate the claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is severe.[37][38]

The severity determination is discussed in terms of what is *not* severe.[39] A medically determinable impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."[40] Because step two is simply to screen out weak claims,[41] "[g]reat care should be exercised in applying the not severe impairment concept."[42]

---

[36] *Id.* §§ 404.1521, 416.921.

[37] *See* Soc. Sec. Ruling (SSR) 85-28 at *3 (1985).

[38] 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019).

[39] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[40] *Id.*; *see* SSR 85-28 at *3.

[41] *Smolen*, 80 F.3d at 1290.

[42] SSR 85-28 at *4.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

2.    The ALJ's Findings

In regard to Plaintiff's left elbow and shoulder, the ALJ highlighted that Plaintiff's imaging revealed no abnormalities and that Plaintiff was diagnosed with lateral epicondylitis of the left elbow in June 2018 and medial epicondylitis of the left elbow in May 2020. The ALJ found that because Plaintiff had few complaints about his left elbow that it did not meet the 12-month durational requirement. As to Plaintiff's bilateral carpal tunnel syndrome, the ALJ highlighted that 1) nerve conduction studies in October 2018 revealed mild median neuropathies at both wrists and thereafter Plaintiff underwent right carpal tunnel release in January 2019, 2) he reported improved symptoms during a postoperative appointment, 3) although he reported wrist pain, he used his right hand for heavy, manual-type labor on a regular basis, and 4) following a normal x-ray in May 2019, Plaintiff's carpal tunnel syndrome appeared resolved according to the attending physician.[43] The ALJ therefore found that Plaintiff's wrist conditions were not a severe impairment. Nonetheless, the ALJ crafted an RFC that limited Plaintiff to frequent bilateral handling and fingering (and frequent overhead reaching with his right upper extremity).

---

[43] AR 21.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

   3.   <u>Severe Impairment of Left Extremity and/or Bilateral Wrists/Hands</u>

The ALJ erred by not finding, either individually or in combination, a severe impairment of the left upper extremity and/or bilateral wrists/hands—substantial evidence does not support the ALJ's findings otherwise. The following medical-record summary highlights the ALJ's error in this regard, i.e., that Plaintiff's left elbow/shoulder and bilateral wrist/hand impairments, when considered in combination, will have more than a minimal effect on Plaintiff's physical ability to perform basic work activities.

In January 2018, Plaintiff sought treatment for chronic left elbow pain, which was exacerbated by a then-recent fall on ice. The treating provider observed left elbow tenderness.[44] The subsequent x-ray of the left elbow did not reveal any fracture or dislocation, but the treating provider during a follow-up appointment in May 2018 still observed tenderness of the left elbow during the physical examination and referred Plaintiff to an orthopedic.[45] In June 2018, Plaintiff again noted that he experienced pain when he gripped something forcefully or when his left arm was touched laterally; the provider observed that Plaintiff had lateral epicondyle tenderness, a positive Tenil's sign over the cubital tunnel, and positive

---

[44] AR 792–94.

[45] AR 837–39.

resisted wrist extension and long finger tests.[46] In July 2018, Plaintiff still reported pain in his left elbow though he also reported that he was experiencing worse pain in his right elbow.[47] During the physical examination, the provider observed both right and left upper extremity pain with no significant decreased range of motion.[48] In October 2018, Plaintiff presented with right wrist pain and intermittent bilateral hand numbness; he underwent bilateral arm nerve conduction studies, which indicated mild median neuropathies at both wrists consistent with carpal tunnel syndrome.[49] In December 2018, the orthopedic observed that Plaintiff had nonspecific pain across the back of his right hand and wrist, and he discussed with Plaintiff that he thought a component of Plaintiff's pain was carpal tunnel syndrome but that it was "not clear" whether Plaintiff had "other potential inflammatory sources of his pain."[50]

A carpal tunnel release was performed on Plaintiff's right hand in January 2019.[51] During the post-operative appointments in February and May 2019, Plaintiff reported that his right-hand numbness was mostly resolved but that he

_____

[46] AR 840–42.

[47] AR 846–48.

[48] AR 848.

[49] AR 898–900.

[50] AR 1096–97.

[51] AR 1121–22.

continued to have diffuse pain across the metacarpophalangeal and other joints, which was consistent with the orthopedic's observations and therefore the orthopedic referred him to a rheumatologist.[52]

In June 2019, Plaintiff was seen by a rheumatologist for bilateral hand pain, swelling in fingers and elbows, and loss of grip strength.[53] On examination he was noted to not have tenderness or synovitis in his hands or elbows, but the rheumatologist opined that Plaintiff likely had generalized osteoarthritis.[54] The next month Plaintiff was again seen by the rheumatologist. Plaintiff was observed with positive bilateral tenderness in his elbows, and the rheumatologist still concluded that Plaintiff likely had generalized osteoarthritis causing multiple joint pain.[55]

In May 2020, Plaintiff reported left arm pain, focused at the elbow, with observed tenderness in the palpation of the distal left bicep body down to the insertion of the distal tendon with some weakness; the provider concluded that Plaintiff's exam was most consistent with tendinopathy or perhaps a partial distal biceps tear.[56] That same day he was also treated by an orthopedic to whom he

---

[52] AR 1164–65, 1197–1200.

[53] AR 1217.

[54] AR 1220–22.

[55] AR 1229–31.

[56] AR 1271–78.

reported that his pain was in the inside portion of his elbow and it radiated down to his hand and that he had pain when gripping and using the hand.[57] The orthopedic observed that Plaintiff had tenderness along the medial epicondyle and that Plaintiff had pain with resisted gripping, wrist flexion, and forearm supination and pronation.[58] The orthopedic opined that Plaintiff had medial epicondylitis of the left elbow.[59]

Plaintiff started physical therapy later that month, during which he was observed with limited strength and range of motion in his left shoulder and left elbow.[60] The physical therapist noted observing Plaintiff with pain in the elbow region and that Plaintiff's neck was irritated with increased resistance.[61]

These summarized medical records indicate that Plaintiff's upper extremity impairments caused pain, tenderness, and loss of strength, thereby impacting Plaintiff's physical ability to perform basic work activities, even after the carpal tunnel release. Consistent with these records, Plaintiff's treating provider in November 2018 diagnosed Plaintiff with chronic pain of both shoulders and carpal tunnel and opined that Plaintiff's physical conditions would cause him shoulder

---

[57] AR 1278–80.

[58] AR 1279–80.

[59] AR 1281.

[60] AR 1282–87.

[61] AR 1285.

and hand pain.[62] Moreover, the medical expert Dr. Morse recognized in December 2018 that it was possible that Plaintiff had wrist/hand issues separate from his carpal tunnel—and the subsequent post-release-surgery treatment records confirm other impairments (generalized osteoarthritis and/or epicondylitis) contributing to wrist/hand issues.[63]

The medical record clearly reflects that Plaintiff suffered severe left upper extremity impairment(s) that lasted longer than 12 months and that Plaintiff suffered an impairment—minimally, generalized osteoarthrosis—that impacted his wrists/hands even after his carpal tunnel release surgery.  For this reason, the ALJ erred by not finding severe left upper extremity impairment(s) and right wrist/hand impairment(s).

### 4.    Consequential Error

The Commissioner argues that any error is harmless because the ALJ crafted an RFC that limited Plaintiff to frequent bilateral handling and fingering and frequent overhead reaching with the right upper extremity. However, it is not clear that this error was harmless.

At the administrative hearing, the ALJ mentioned she selected a frequent handling and fingering limitation because "all references to carpel tunnel were

---

[62] AR 997–99.

[63] AR 47–48.

listed as mild."[64] And consistent therewith, the ALJ mentioned in her opinion that Plaintiff's wrist/hand pain was alleviated by the carpal tunnel release on the right hand. But the ALJ did not mention the rheumatologist's diagnosis—and medical observations consistent therewith—of generalized osteoarthrosis in the wrists/hands, nor the physical therapist's observations of left elbow pain and reduced range of motion following the carpal tunnel release. Moreover, although as the ALJ highlighted Plaintiff reported continued use of his hands, Plaintiff also reported during that same treatment visit that he needed to stop intermittently to allow his hands to rest.[65]

Even the medical expert was uncertain in December 2018 as to whether either a frequent *or* occasional handling and fingering limitation was required:

> The carpel tunnel thing is impossible for me to speculate on, I don't have enough records. And he's going to have an operation, but at the moment there's probably fine and gross handling limitation preoperatively. And I can't tell you whether its's frequent or occasional because there's just not enough there for me. But there certainly would be manipulative limitations involving overhead reaching, fine and gross handling.[66]

Because the ALJ did not mention Plaintiff's generalized osteoarthrosis and that Plaintiff was observed with reduced strength and range of motion by the physical therapist following his carpal tunnel release, the uncertainty as to the

---

[64] AR 69.

[65] AR 1197.

[66] AR 48–49.

extent of Plaintiff's handling and fingering limitation remains. Without a more meaningful discussion by the ALJ as to the entire scope of impairments impacting Plaintiff's upper extremities following the carpal tunnel release and because the ALJ cherry-picked statements from the record, the ALJ's step-two error cannot be deemed harmless.

If a more stringent handling and fingering limitation is assigned, the vocational expert testified that a limitation to occasional handling and fingering precludes competitive employment.[67] And while Plaintiff did not seek care for upper extremity conditions until after the alleged onset date in 2015, he did seek care for such conditions by January 2018—two years before the ALJ's found disability date of April 8, 2019, which was based on Plaintiff's changed-age category.

The ALJ's step-two error was therefore consequential.

**B.    Remand for further proceedings.**

The ALJ's step-two error requires a remand for further proceedings.[68] This record does not clearly support an award of benefits. Even if Plaintiff became disabled before his age category changed at the age of 50, it is not clear whether disability began as alleged on July 1, 2015, or at a later date.

---

[67] AR 87–88.

[68] *See Leon v. Berryhill*, 800 F.3d 1041, 1045 (9th Cir. 2017); *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

Amongst the other required considerations on remand, the ALJ is to also consider:

- What severe left upper extremity impairment(s) Plaintiff had and on what date did it/they begin.

- What severe right wrist/hand impairment(s) Plaintiff had and on what date did it/they begin.

- Dr. Morse's testimony about Plaintiff's ability to ambulate on uneven ground and how it impacted, if at all, the step-three listings analysis and the RFC.

- The timing, sequence, and duration of Plaintiff's impairments.[69]

---

[69] *See Smith v. Kijakazi*, 14 F.4th 1108, 1113–16 (9th Cir. 2021). For instance, the imaging reveals that Plaintiff's lumbar impairment progressed in severity. *Compare* AR 948 (March 2017: moderate disc space narrowing and osteophyte spurring at L3-L4 and mild anterior wedging at L1) *with* AR 951 (Nov. 2017: amongst other findings, moderate disc space narrowing with degenerative endplate change and endplate spurring at T12-L1 and L1-L2; moderate to severe disc space narrowing with degenerative endplate change and bilateral neural foraminal narrowing and broad-based central disc protrusion with associated posturer annular tear at L2-L3; severe disc space narrowing with degenerative endplate change and endplate spurring, moderate severe degenerative endplate edema at L3-L4; moderate disc space narrowing at L4-L5 and mild disc bulge with endplate

- The support for a medical opinion when the opinion was issued—and then any improvement in the medical condition(s) thereafter.[70]

- That Mr. England's 2018 opinion that Plaintiff could perform "medium work" was defined therein as the ability to lift 50 pounds maximum and frequently lift and/or carry up to 25 pounds and did not mention any exertional requirements as to walking, standing, or sitting. Likewise, Mr. England's 2016 opinion similarly defined "medium work," with the additional language that "frequently means the person is able to perform the function for 2.5 to 6 hours out of an 8-hour day. It is not necessary that performance be continuance."[71]

- That if the ALJ discounts Plaintiff's symptom reports, a specific, clear, and convincing reason must be provided for discounting *each* reported symptom.[72]

---

spurring along with moderate severe bilateral degenerative facet disease causing moderate severe bilateral neural foraminal narrowing).

[70] For instance, Dr. Palasi's less-than-sedentary opinion was issued about one month before Plaintiff's right-knee surgery and about a year before Plaintiff's final left-knee surgery. And after the surgeries, Plaintiff still had advanced chondromalacia in his left knee.

[71] AR 616.

[72] *See Garrison*, 759 F.3d at 1010.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

In addition, the ALJ must 1) order a consultative physical examination addressing Plaintiff's limitations resulting from his physical impairments, including his upper extremity, knee, and lumbar limitations,[73] and/or 2) elicit testimony from a medical expert qualified to testify as to Plaintiff's upper extremity, knee, and lumbar impairments before he turned 50 and the resulting exertional, postural, and manipulative limitations.[74]

After developing the record, the ALJ must reevaluate Plaintiff's disability applications and issue a new disability decision.

### V.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.       The case caption is to be **AMENDED** consistent with footnote 2.

---

[73] The record indicates—both through Plaintiff's symptom reports and medical observations—that Plaintiff's lumbar conditions caused pain while sitting. *See, e.g.*, AR 795 ("He typically can sit for 15–30 minutes, stand for 15–30 minutes, and walk 45–60 minutes."); AR 1259 ("Patient unable to sit still or bend his knees when sitting, standing leaning over the back of the exam chair or moving around the room.").

[74] The consultative examiner and/or medical expert must be given sufficient medical records to allow for a longitudinal perspective. The record must clearly identify what medical records the examiner/expert reviewed.

2.      Plaintiff's Motion for Summary Judgment, **ECF No. 17**, is **GRANTED**.

3.      The Commissioner's Motion for Summary Judgment, **ECF No. 18**, is **DENIED**.

4.      The Clerk's Office shall enter **JUDGMENT** in favor of Plaintiff **REVERSING AND REMANDING** the matter to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

5.      The case shall be **CLOSED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to file this Order and provide copies to all counsel.

**DATED** this 24th day of February 2022.

_Edward F. Shea_
_____

EDWARD F. SHEA
Senior United States District Judge